# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 28, 2011

## STATE OF TENNESSEE v. MICHAEL MONTELL WILLIAMS

**Appeal from the Criminal Court for Hamilton County**
**No. 260622     Rebecca J. Stern, Judge**

**No. E2010-02402-CCA-R3-CD - Filed October 28, 2011**

The Defendant, Michael Montell Williams, was indicted by the Hamilton County Grand Jury for abuse of a corpse, especially aggravated kidnapping, felony murder, and premeditated first degree murder.[1]  Following a jury trial, the Defendant was convicted of one count of premeditated first degree murder and one count of abuse of a corpse.  See Tenn. Code Ann. §§ 39-13-202, -17-312.  In this appeal as of right, the Defendant contends that (1) the trial court erred in denying his motion to sever the abuse of a corpse charge from the premeditated first degree murder charge; (2) the trial court erred in allowing a toxicologist to testify regarding his opinion on the likelihood that prescription drugs found in the victim's blood caused her death; (3) the trial court erred in denying his motion for a mistrial; and (4) the evidence was insufficient to sustain his convictions.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Ardena J. Garth, District Public Defender; Mary Ann Green, Assistant Public Defender (at trial); Richard K. Mabee, Assistant Public Defender (on appeal); and Jonathan T. Turner, Chattanooga, Tennessee (at trial), for the appellant, Michael Montell Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox, III, District Attorney General; and M. Neal Pinkston, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]The trial court dismissed the especially aggravated kidnapping and felony murder charges prior to trial.

# OPINION

## FACTUAL BACKGROUND

### *I. The Victim's Disappearance*

Travis Smith, the victim's ex-husband, testified at trial that he and the victim divorced in August 2005. The two reconciled in April 2006, and the victim moved back into Mr. Smith's residence on Looney Street in Cowan, Tennessee. The victim, prior to her relationship with Mr. Smith, had been in a relationship with the Defendant. Mr. Smith was aware that after the divorce, the victim and the Defendant "started seeing each other" again. However, Mr. Smith denied that the reason for his divorce was because the victim was having an extramarital affair with the Defendant. Mr. Smith admitted that his divorce petition listed marital misconduct as a reason for the divorce, but maintained that his reasons for the divorce were irreconcilable differences and because the victim "was having a hard time getting pregnant."

Mr. Smith testified that after the victim moved back in with him, he began to receive phone calls and messages from the Defendant. The Defendant called the victim "a whore" and said that "she had been with a bunch of guys and [that] he was the only one ever man enough to satisfy her." In May 2006, Mr. Smith changed his phone number because he had received so many harassing phone calls from the Defendant. Mr. Smith testified that he believed the Defendant was "saying all kinds of negative stuff about [the victim], trying to make [him] mad at her." The Defendant also sent a package to the victim containing "an unopened box of condoms," lubricant, and other items.

Mr. Smith described the victim as less than five feet tall, weighing around 95 pounds, and "real shy." Mr. Smith testified that the victim did not like to travel because "[s]he was just a homebody" and "[s]he didn't even like going to the store by herself." The victim "had very poor vision" but was otherwise "perfectly healthy" and did not take any medication. Mr. Smith testified that the victim "was the happiest person you ever seen" following their reconciliation and that she had never mentioned anything to him about committing suicide because "[s]he was always dead set against suicide."

On Monday, June 12, 2006, Mr. Smith left the victim in bed at their home to go to his job as "an over-the-road truck driver." The weekend before, he and the victim had decided to remarry that August. Mr. Smith spoke with the victim over the phone several times that day. Mr. Smith testified that the victim never mentioned anything to him about her going on a trip or using his car when they spoke that Monday. Mr. Smith also testified that the victim

did not sound despondent or make any mention of committing suicide. Instead, she sounded like "[s]he was perfectly fine" and in "a happy state of mind."

Mr. Smith next heard from the victim on Tuesday morning when she left "a real strange message" on his voicemail. The victim told Mr. Smith that "her cell phone was dead," that "she had to call [him] from a calling card," and "that she had to be gone for a few days." Mr. Smith tried to reach the victim on her cell phone and their home phone, but got no answer. The victim called Mr. Smith back approximately 30 minutes later and told him that "she had to be gone for a few days . . . to do some thinking" and "that she was with a friend." Mr. Smith considered the victim's behavior odd and "just [not] her character," so he returned home that evening.

Upon returning home, Mr. Smith found that his car was missing. Inside the house, Mr. Smith found a letter signed by the victim. The letter read as follows:

> Travis, I need some time alone to think about certain things. This is something I just have to do right now. I didn't tell Mom about this because she'll be a b---h about it. I'll deal with her when I come back. I'm not telling anyone where I'm going or who I'm with or where I'll be. I'll be back in a couple of days or sooner.

Mr. Smith thought the letter was "unusual" and "strange" because the victim "always" referred to her mother as "mamma" instead of "mom" and because the body of the letter was written in pencil but "it was signed in ink pen." Mr. Smith noticed that some of the victim's toiletries were missing, including her hairbrush and toothbrush. He also found that his Skelaxin, a muscle relaxer he had previously been prescribed, was missing. However, the victim's contact lenses and make-up had been left at the house.

Mr. Smith then spoke with the victim's mother and learned that the victim had missed an appointment for a manicure that they had scheduled for Tuesday afternoon. The victim's mother also told Mr. Smith that David Scissom had told her that he had dropped the Defendant off at Mr. Smith's house on Monday. Mr Smith contacted the police and reported that his car was stolen and that the victim had been kidnapped. Mr. Smith was able to contact the victim sometime Tuesday night or Wednesday morning either by phone or text message. Mr. Smith told her that he had reported her as being kidnaped, and she told him "don't do anything . . . just please don't do anything."

On Wednesday morning, Mr. Smith discovered that his garage had been broken into. Mr. Smith testified that the door to his garage appeared to have been pried open. Later that day, the victim called Mr. Smith. The victim told Mr. Smith that she loved him and "wanted

[him] to tell her [that he] loved her." Mr. Smith testified that he begged the victim to tell him "where she was or something" and to let him help her. The victim told Mr. Smith that she could not tell him anything and said, "Please, tell me you love me." The victim then told Mr. Smith, "I got to go," and he "heard a male voice holler hey," right before the phone disconnected. After that phone call, Mr. Smith "never heard from [the victim] again."

David Scissom testified that he had been the Defendant's friend for eight or nine years. According to Mr. Scissom, on June 12, 2006, the Defendant called him to ask if he would take the Defendant to see "some girl he was seeing." Mr. Scissom was under the impression that the Defendant was dating the victim, but the Defendant told him he was going to see a woman named Carrie Hackworth. Mr. Scissom picked the Defendant up and drove for about 40 minutes before the Defendant told him to stop at "a sewage plant." The Defendant got out of the car, told Mr. Scissom to "come back and get him in two or three hours," and then "walked through a field." Mr. Scissom testified that he did not see any houses near where he dropped off the Defendant. Mr. Smith testified that there was a sewage treatment plant "maybe 100 yards, 150 yards past [his] house."

Mr. Scissom came back to the spot where he had left the Defendant a few hours later, but he did not see the Defendant so he went home. After Mr. Scissom was back home, the Defendant called him and told him that "he was just going to stay all night with that girl." Mr. Scissom testified that the Defendant had left a backpack in his car, but he never looked to see what was in it. Later that week, the Defendant left three messages on Mr. Scissom's answering machine. In these messages the Defendant told Mr. Scissom that "everything was all right" and that "her family was crazy and stuff and they was going to run off together or something like that." The Defendant did not say "who he was going to run off with." Mr. Scissom testified that he did not think he was taking the Defendant to the victim's home because he never mentioned the victim. Mr. Scissom also testified that the Defendant never said anything to him about committing suicide.

Christy Hermann testified that she was the night auditor at the Hampton Inn on Shallowford Road in Chattanooga, Tennessee. Ms. Hermann testified that she worked from 11:00 p.m. to 7:00 a.m. and closed out the day shift, did all of the night paperwork, and checked in customers who came in during her shift. According to Ms. Hermann, the Defendant rented room 128 at 5:37 a.m. on Tuesday, June 13, 2006. A woman matching the victim's description was with the Defendant. Ms. Hermann testified that the victim "was real quiet and shy" but "seemed fine." Ms. Hermann described the Defendant as being "happy-go-lucky" and acting "like a guy in love." The Defendant told Ms. Hermann that he "was there to show [the victim] a good time." The Defendant paid in cash to rent the room through 11:00 a.m. on Thursday.

Ms. Hermann saw the Defendant and the victim again at 1:41 a.m. on Thursday, June 15, 2006. The Defendant paid cash for another night in Room 128. Ms. Hermann testified that the victim "was quiet and shy" and "kept her head down." The Defendant continued to act like "a man in love." The Defendant tried to kiss the victim in front of Ms. Hermann, but the victim "kind of shrugged away from him . . . [like] she didn't want him to kiss her." Ms. Hermann testified that the victim "expressed no fear or concern that [she] could see." Ms. Hermann also testified that she did not receive any disturbance calls about Room 128 during any of her shifts that week.

At 3:33 a.m. on Friday, June 16, 2006, the Defendant returned to rent the room for another night. Ms. Hermann testified that the victim was not with him Friday morning. Ms. Hermann noticed that the Defendant was acting "kind of strange." He was "jumping around and happy-go-lucky." The Defendant asked if Ms. Hermann noticed anything different about him, and he told her that "he had changed from wearing black to dark blue." The Defendant also told Ms. Hermann that he was in the military, had recently returned from Iraq, and was leaving again for Iraq. Ms. Hermann testified that she thought the Defendant was lying about being in the military and subsequently learned that he had never been in the military or gone to Iraq. Ms. Hermann did not work on Saturday, June 17, 2006.

Erica El Guffey testified that she was employed as the reservations manager for the Hampton Inn. At approximately 10:15 p.m. on Wednesday, June 14, 2006, Ms. El Guffey received a call from Room 128. A male caller requested "[n]ot to be disturbed. No phone calls, no housekeeping, not for anyone to know that they [were] even on the property." The caller told Ms. El Guffey "that he was in an argument, a fight with his fiancee and that he didn't want to be disturbed." Ms. El Guffey admitted on cross-examination that she did not receive any disturbance calls about Room 128 that night.

*II. The Police Investigation*

Detective Kenneth Burnette, Jr., of the Chattanooga Police Department (CPD) testified that he was working as a patrol officer on June 17, 2006, when he received "an unknown trouble call" from the Hampton Inn on Shallowford Road. The caller had reported finding "a male party in the floor with a large amount of blood." Detective Burnette arrived at the Hampton Inn at approximately 1:00 p.m. and proceeded to Room 128. The door was locked but Detective Burnette and Officer Terry Barnes were able to enter the room using a master key. When the officers entered the room they found the Defendant lying on the floor between the two beds with his head and right arm underneath the bed closest to the wall. When the officers announced themselves, the Defendant began "moving and mumbling" incoherently.

Detective Burnette testified that the room was "[r]ather messy." The officers saw pills strewn across the room and "large amounts of blood." The officers continued to announce their presence and ordered the Defendant "to bring his right hand into view." The Defendant started to mumble "a little bit louder" and reached towards the night stand with his left hand. The officers noticed a Glock handgun sitting on the night stand "with the handle and the trigger mechanism facing towards" the Defendant. The officers drew their weapons and ordered the Defendant to show his right hand while Officer Barnes secured the Glock. After the weapon was secured, the officers pulled the Defendant out from underneath the bed "to make sure that he didn't have anything under the bed." The Defendant continued to yell and mumble incoherently at the officers.

The officers noticed a large amount of blood on "the side of the bed on the pillows," the floor of the bathroom, the bathroom sink, and the toilet. The officers checked the Defendant to determine if he was the source of the blood. There was no blood on the Defendant, and the "only thing that [the officers] saw was a cut on his arm." As the officers began to look around the room, they noticed a "large lump of sheets" on the bed the Defendant's head had been under. Underneath the sheets the officers discovered the victim's body. There were no clothes or blood on the body, and it "appeared to be purplish in color." As the officers examined the body, the Defendant exclaimed, "[D]o not let her get the last crack rock." However, there was no crack cocaine found in the room, and the Defendant's blood tested negative for the presence of cocaine. Detective Burnette admitted on cross-examination that nothing appeared to be damaged in the room and that the Defendant could have been "messed up on drugs."

Officer Brian Russell of the CPD testified that he was assigned to the crime scene unit on June 17, 2006. He arrived at Room 128 at approximately 2:14 p.m. that day. During his search of the room, Officer Russell found a woman's jacket and pair of jeans on the coffee table as well as a bag. Inside the bag were a woman's pair of jeans, four pairs of underwear, a towel, a bottle of vitamins, sanitary pads, and a pair of eyeglasses. Officer Russell also found a woman's t-shirt, pair of jogging pants, and socks next to the bed where the victim's body was discovered. This was all of the women's clothing found inside the hotel room. Officer Russell testified that the victim's body was completely unclothed. The body was placed on its left side with the "legs bent" and the arms "bent up closer to [the] face." The skin was purple from where the blood had settled, suggesting that the body "had been in that position for a while."

Officer Russell testified that the weapon found on the night stand was a Glock .9mm. The gun was fully loaded and ready to fire. Officer Russell also discovered a second fully loaded clip underneath the night stand. Several prescription and "over the counter medications" were found throughout the room along with empty packaging for more

medications. Officer Russell testified that he found an empty packet of "Double Action Ephedrine," an empty pack of a diet and energy drug "called Stacker Three," Emetrol pills "for nausea," "[o]ne Source Men's multivitamin, multimineral and herb supplement," a prescription bottle of Skelaxin, several empty packets of "Unisom Sleep Gels," two "unisom Sleep Gel" pills, "little blue pills . . . labeled Beanca," an empty packet of "Sleep Relief Soft Gel," and an empty packet of "Walsome Nighttime Sleep Aide." Officer Russell found a Walgreen's receipt on the coffee table time stamped for 5:58 p.m. on June 16, 2006. The receipt showed a purchase of "Emetrol, Unisom, Walsome, and . . . another Unisom packet." Officer Russell testified that the pills found on the floor were Rolaids.

On the night stand, Officer Russell found a tape recorder with a cassette tape inside. Side one of the tape contained over two hours of recordings consisting mostly of conversations between the Defendant and the victim. These conversations "could be characterized as 'small talk.'" There was no conversation regarding suicide or any mention of suicide on side one of the tape. Side two of the tape contained "a lengthy statement made by" the Defendant, in which the Defendant stated as follows:

You'll hear that I stopped recording and started it at different times when me and [the victim] were talking about a lot of different things. She wanted it to look like she was abducted and brought here and killed because she didn't want her family to think it was suicide. But we decided we didn't want to live with each, without each other. And we decided to die together because her mother made too much trouble. And there was a lot of other problems, me having a hard time finding work, although I found a good job. And her mother made a lot of trouble and wouldn't leave her alone, and I had to move to Pennsylvania and it made things very difficult. And we figured this is the only way we could be together.

If you listen to the tape it's quite obvious she wasn't here against her will. And she didn't want me to record her because she wanted everyone to think it was a murder instead of a suicide, both of us doing it together. And the pills weren't working right so she wanted me to smother her. And that's just the way it went. That's why I'm recording this after she's already died because she didn't want us [sigh]. See I feel a little funny because I took a bunch of pills, and she took a bunch and they didn't work so she drank liquor and that didn't work so she decided to have me do it this way. I'm stopping and starting this a lot because I can't think.

Oh, at ah Logan's Stakehouse . . . there's a guy that will remember us being in there and it was obvious she wasn't abducted. We were getting along

fine and everything was fine . . . . But you can take pictures of us there and see if he remembers seeing us together. And Oasis Liquor Store, we were in there. And here at the hotel, we were in here kissing in the lobby and everything. I just want yous to know it wasn't no kind of abduction thing. But [the victim] wanted it to look that way because she didn't want people to think that she would commit suicide. But I want people to know the truth because I don't want them to think I'm a murderer.

We love each other and our families got in the way and her mother made a big problem of everything. She's always loved me more than anything. She left her husband for me, but she went back to him from pressure from her mother because she wanted to get out of the house from living with her mother for six months she was driving her crazy. And I came back, and we knew we couldn't be together anytime soon so we decided to do this.

But I just want to make sure that my parents tell my son maybe it was some kind of accident, not the truth. That like maybe I died . . . in a four-wheeler accident of some kind. And I'm sorry for what this will do to my parents, but if they would have let me bring her with me when we moved, I would have had the ambition I needed to find work real quick. And she could have took me every day to find jobs. Everything would have worked out fine if they would have let her come right away. But they didn't. And I knew this would happen, but they wouldn't listen to me because they never trusted me or given me any chance or credibility. If they would have let her come right away, this wouldn't have happened.

Well like I said, by the recordings on this tape you can tell she wasn't abducted. And she didn't want me to record her because she wanted everyone to think it was a killing. But, like I said, the guy at the Logan's Roadhouse, the people in the lobby of this motel, this recording. You know, you don't talk like that when you're abducted. And the note she wrote her husband, and she wasn't forced to wrote it, write it. See I sound funny because I took a lot of pills, so.

And I had sex with her after she was dead. She told me to go ahead and do it if she went first because it's, she never wanted to take it in the ass. So, she said I could try it afterwards. And I tried it because I had to be with her one last time. I know it sounds sick and weird, but, you know, it's something we talked about. We loved each more than anything in the world.

-8-

I just want my parents to know I'm sorry and tell [my son] it was some kind of accident.

And if there's any way to get phone records from my calling card it will show that we talked to each other ever sense she went back to her husband. . . . And even after her husband, ex-husband, had the number changed she gave me the new number . . . she gave me the number and we talked all the time. My Mom and Dad know it, they remember seeing [her number] . . . . And I sent her Federal Express letters so they'd get there fast before her ex-husband, Travis, got home. And she said she threw them away, but naturally she looked at them and read them and everything. They were love letters.

And these pills we took were pills I got from my father. He didn't know about it of course, but. Stuff to slow his heartbeat down make his blood pressure low, you know, stuff like that.

And she decided to go with suffocation because she couldn't bear to, stand, you know, she couldn't stand to thinking of being shot or anything like that. But she picked the not breathing way. I didn't like doing it, but she didn't want to take anymore pills. She said they were making her feel sick.

Like I said, these pills messed me up, and we decided that we had to leave enough for me because I didn't want to shoot myself either. It scared me, and uh, you know, I've been shot before, but. We decided we had to leave enough for me because she took about the same amount, well less than the same amount but it wasn't working real good. So we decided to leave enough for me. That's why she went, you know, suffocation.

And no matter what her mom thinks, her mom didn't know her fully at all. Her mom will say that she would never do something like this. Her mom didn't know anything. She didn't know about [the victim] hurting herself and digging her fingernails in her arm. Her mom had no idea.

And I don't want to, but if these pills don't work I'll have to shoot myself. That's something I really don't want to do.

And I want everyone to know that David Scissom had nothing to do with this. I told him he was giving me a ride to some other girl's house 'cause we wanted to keep this quiet as possible because I know he talks. So we told

him that, we decided to tell him that I was going to some other girl's house, not [the victim's].

And [the victim] went back to her ex-husband to shut her mom up because she couldn't stand hearing her no more. And living in that house with her for six months drove her absolutely crazy because her mom was always on her, wouldn't leave her alone, wouldn't shut up.

And like I said, my mind's messed up from these pills. [The victim] wanted to go first because she wanted to make sure that it was done because if I did it first, she didn't know if she could be brave enough to go through it herself on her own without me doing it for her.

The Defendant then engaged in a lengthy discussion regarding ghosts, the Bible, animal sacrifice, the possible existence of a supreme being, and the mysterious nature of the universe. The Defendant also stated that the victim's mother read to the victim portions of the Bible about "whoredom" because the victim had engaged in an extramarital affair with the Defendant. The Defendant also accused the victim's mother of having extramarital affairs. The Defendant then concluded the tape by stating,

The pills didn't work on me, and I didn't have the nerve to shoot myself. I tried cutting myself in certain places to bleed to death but I couldn't make big enough cuts. So, then I took the car and went up, I don't know, somewhere far away from here and ran an exhaust hose into the car, and that didn't work. I mean I was in there for like two and a half hours and nothing happened and plenty of exhaust smoke was coming in there, but nothing happened. So now I've got a whole bunch of sleeping pills. And I asked the pharmacists about it, and she said that'll. I asked her you know, hypothetically, "Oh yeah, what if somebody was to take all these." So now I'm going to try that. And I made a mess of the place when I came back 'cause I feel nauseous and sick from them pills that didn't kill me. One of their warnings is nausea and heartburn and I've got it bad and it didn't kill me. So, I didn't care about making a mess here. I slopped everything all over the place and threw up in the toilet and everything. So now I'll try the sleeping pills.

Officer Russell testified that in addition to the tape recorder, he also found "sex lubricant" and nude photos of the victim on the night stand. Officer Russell also testified that there were several empty liquor bottles in the room as well as a two-liter bottle of Pepsi near the victim's body, which contained alcohol and had the victim's thumb print on it. The victim's cell phone was also found in the hotel room. Officer Russell testified that the room

-10-

was "a mess" but that nothing appeared to be broken. There was a lot of trash strewn about the room including several fast food packages and a condom wrapper. There was also vomit on one of the beds.

Officer Russell testified that Mr. Smith's car was parked in the hotel's parking lot outside Room 128. In the trunk of the car, Officer Russell found an unopened roll of duct tape as well as a receipt from Lowe's. The receipt was dated June 16, 2006, and time stamped at 1:53 p.m. The receipt showed a purchase of a roll of duct tape and ten feet of PVC flex pipe. The pipe was not found in the car. Inside the car, Officer Russell found a Wendy's receipt showing the purchase of "one hamburger combo" at 5:45 a.m. June 16, 2006.

Royellen Lamar was a crime scene technician with the CPD on June 17, 2006. Ms. Lamar testified that she took a DNA sample from the Defendant. Ms. Lamar also photographed wounds found on the Defendant at the time of his arrest. The Defendant had abrasions on his neck, arms, and wrists. The Defendant also had a cut on his right arm. Ms. Lamar testified that the Defendant had no other injuries besides those shown in the photographs. Ms. Lamar admitted on cross-examination that she did not know the source of the Defendant's injuries.

Dr. Lisa Staton testified that she was the attending physician on call when the Defendant was admitted to Erlanger hospital. Dr. Staton testified that the Defendant was admitted at 2:34 p.m. on June 17, 2006, but she did not actually see the Defendant until the following day. However, Dr. Staton testified that she had reviewed all of the Defendant's medical records. The Defendant seemed confused, had slurred speech, and was disoriented to place and time. The Defendant also had dry mucous membranes, and the appearance of his skin suggested that he was dehydrated. The Defendant did not present any signs of cardiovascular trauma. The CPD officers guarding the Defendant reported that he was suffering from auditory hallucinations and talking to the clock on the wall. The Defendant's drug screen "was completely negative," and there was no alcohol in his blood. The Defendant was admitted to the hospital for "altered mental status" as well as renal failure, abnormal liver tests, and a urinary tract infection.

Defense counsel theorized, based on the empty packaging found in Room 128, that the Defendant had taken 78 sleeping pills. Dr. Staton testified that someone who had ingested that many sleeping pills would have been in "a nearly comatose state" and that she could not "imagine that . . . someone would be awake with that." However, Dr. Staton admitted that dry mucous membranes and dehydration were symptoms of an overdose of sleeping pills and that the Defendant's symptoms "could be related" to an overdose. Dr. Staton admitted that the Defendant's blood was not tested for the presence of sleeping pills,

-11-

Skelaxin, or the heart medications Verapamil and Atenalol. Verapamil, Atenalol, and Skelaxin were not tested for because Dr. Staton did not consider them to be commonly abused drugs. Additionally, the Defendant never mentioned to the treating physicians that he had taken any medications. Dr. Staton testified that the Defendant's delirium could have been caused by his infection or by abuse of medication. Dr. Staton also testified that Verapamil would cause lower blood pressure and heart rate. However, the Defendant presented with an elevated blood pressure that resolved to normal and a rapid heart rate.

Sergeant Bill Phillips of the CPD testified that on June 19, 2006, he assisted Detective James Holloway in interviewing the Defendant. Sergeant Phillips recalled that the Defendant seemed "happy, was very cooperative, was very helpful, and was joking." Sergeant Phillips testified that the Defendant made a "spontaneous" statement, telling the officers that "[i]t's like a murder suicide, a plan to do this together."

Detective Holloway of the CPD testified that the Defendant spontaneously made the following statement:

> I'm still so messed up on those medications, my mind's not right. I can't spell my own name. I will tell you one thing. I will tell you that we were supposed to die together. It's not just like a murder. It's like a murder/suicide [sic]. A plan to do this together, but I couldn't die.

Detective Holloway testified that the Defendant made the statement two days after the victim's body was found and that the Defendant had not been given any medication during his hospitalization. The Defendant initialed his statement and verbally provided Detective Holloway with his name and address.

Detective Holloway testified that during his investigation, he was able to determine that the victim's cell phone had been used between June 13 and June 16, 2006. Detective Holloway also recovered surveillance footage from Lowe's showing the Defendant buying the PVC flex pipe, which resembled a hose. Detective Holloway was never able to recover the pipe. Detective Holloway admitted that the pipe was long enough to reach from the exhaust pipe of Mr. Smith's car to the driver's side window. However, Detective Holloway testified that there was no evidence the PVC pipe had been attached to the exhaust pipe or that there was "smoke or soot or noxious odors emanating from the vehicle." Detective Holloway also investigated the Defendant's claim that he had served in the military and found no records that the Defendant had ever been a member of the armed forces.

### III. Expert Testimony

Frank Basile testified that he was a forensic biologist employed with Bode Technology. Bode Technology had a contract with the Tennessee Bureau of Investigation (TBI) to assist the TBI in processing evidence. Mr. Basile was qualified as an expert in serology, the science of identifying bodily fluids. Mr. Basile testified that as part of this case, he received a "postmortem sexual assault evidence collection kit" from the TBI. The kit contained vaginal, anal, and oral swabs from the victim, as well as nail clippings from the victim. Mr. Basile testified that the vaginal and anal swabs tested positive for the presence of semen. There was no semen on the oral swab, and there was no blood on the victim's finger nails. Mr. Basile also tested swabs from "a bathroom floor," "a back door," a knife found in Room 128, "a napkin," and "a console." All of these swabs tested positive for the presence of blood.

Ashley Fulmer testified that she was a forensic scientist employed by Bode Technology. Ms. Fulmer was qualified as an expert in DNA identification. Ms. Fulmer testified that she was unable to identify the source of the semen found on the vaginal swab. However, the semen found on the anal swab was a 1 in 30 quadrillion match with the Defendant's DNA sample. Ms. Fulmer testified that she also found DNA consistent with the Defendant's profile on the finger nail clippings from the victim's left hand. Ms. Fulmer also testified that DNA from both the victim and the Defendant was found on the handle of the knife found in the hotel room. On cross-examination, Ms. Fulmer admitted that her testing could not determine how or when the Defendant's semen had been deposited into the victim's anus.

Dr. Timothy Robert testified that he was a forensic toxicologist employed by AEGIS Sciences Corporation (AEGIS). Dr. Robert testified that AEGIS was a private forensic toxicology testing laboratory and that he served as the laboratory director and vice-president of laboratory services. Dr. Robert received his Ph.D in biomedical sciences with a concentration in pharmacology from the Quillen College of Medicine at East Tennessee State University. Dr. Robert testified that the AEGIS lab performs approximately 150,000 toxicology tests a year, including 250 postmortem cases a month. Dr. Robert was qualified as an expert in toxicology.

Initial testing on samples of the victim's blood showed the presence of Skelaxin and Verapamil. Dr. Robert testified that his lab was able to perform a confirmatory test on the Skelaxin, but was not able to perform a confirmatory test regarding the Verapamil. The sample was sent to a second laboratory for a confirmatory test, but "a transcription error occurred" causing the AEGIS lab to "not accept that result as a finding." AEGIS employees mistakenly believed that there was an insufficient amount of blood remaining to perform a

second confirmatory test. However, when it was eventually determined that there was enough blood remaining, a second confirmatory test was ordered for Verapamil and Atenolol.

The confirmatory testing showed that the concentration of Verapamil in the victim's blood was 5,400 nanograms per milliliter, the concentration of Atenolol was 830 nanograms per milliliter, and the concentration of Skelaxin was 4,130 nanograms per milliliter. Dr. Robert testified that the amount of Verapamil in the victim's blood could have actually been lower than the amount shown in the test results due to a phenomenon known as "postmortem redistribution." Dr. Robert explained that the Verapamil would have been "present at significant concentrations in the heart muscle" and, after the victim's death, "the drug [could have] diffuse[d] . . . from the tissue into the [heart] blood." This diffusion would result in a sample of heart blood having "a higher concentration than peripheral blood." Dr. Robert testified that the victim's blood sample was heart blood. Dr. Robert also testified that due to postmortem redistribution, the actual amount of Verapamil in the victim's blood could have been as low as 3,600 nanograms per milliliter. However, on cross-examination, Dr. Robert admitted that "no matter what fancy calculations [he] put on this 5,400 nanograms," the amount of Verapamil in the victim's blood would still have been within the lethal concentration range for the drug.

Dr. Robert testified that a drug's lethal concentration range is "based on publications from the scientific literature from postmortem cases that are reported from around . . . the world." Dr. Robert explained that the lethal concentration ranges were "useful road signs" in determining a cause of death, but "the data is flawed by the fact that there's a [huge] variance in individual responses to drugs." Dr. Robert further complained that the ranges failed to take into account the doses involved. This troubled Dr. Robert because "[s]ometimes massive consumptions of [a] drug are involved and before a person can expire the drug is absorbed at incredibly high concentrations." The ranges also include poly-drug cases where "a person doesn't overdose on a particular single drug, but on other drugs as well." Dr. Robert concluded that a lethal concentration range "is useful as a guideline to help with the interpretation of cases, but it is not in any way definitive." Dr. Robert testified that the lethal concentration range for Verapamil was between 900 nanograms per milliliter and 85,000 nanograms per milliliter. Dr. Robert further testified that the amount of Atenolol in the victim's blood was "higher than the expected concentration after a typical therapeutic does," but that it was not within the lethal concentration range. However, Dr. Robert did admit that Verapamil and Atenolol "both present together would be increasingly toxic." Dr. Robert testified that the amount of Skelaxin in the victim's blood was "not in the toxic range [and] certainly not in the lethal range."

Following Dr. Robert's testimony regarding the lethal concentration ranges, the State asked Dr. Robert if he could "say with any degree of medical certainty whether these drugs

would have caused [the victim's] death." Dr. Robert began to answer when defense counsel objected on the grounds that "[t]his [was] not his area of expertise, . . . [h]e's a pharmacologist, not a medical examiner" and that Dr. Robert was "testifying to medical examiner type information." The trial court overruled the objection stating that Dr. Robert was "giving his opinion based on the lab results . . . [b]ased on hypothetical opinions." Dr. Robert responded to the State's question by stating that "in my opinion, because of the fact that these concentrations singularly are not extremely high concentrations, that it is in my opinion not a sound conclusion to believe that these concentrations would in and of themselves be [the] cause of death in a particular individual." Dr. Robert admitted on cross-examination that he was not a medical examiner, that he had never performed an autopsy, that he had never signed a death certificate, that he had never made a legal determination "on the cause of the death," and "[t]hat's outside [his] area of expertise."

Dr. Frank King testified that he was the Hamilton County Medical Examiner and was qualified as an expert in forensic pathology. Dr. King testified that he was in charge of investigating the victim's death, but that he did not personally perform the autopsy on the victim. Due to a backlog of cases at the Hamilton County Medical Examiner's office, the autopsy was instead performed at the office of the Davidson County Medical Examiner. Dr. King testified that he reviewed the autopsy report and photographs, the toxicology reports, and the facts and circumstances of the victim's death in making his determination regarding the cause of death. Dr. King concluded that the manner of death was homicide and that the cause of death was "apparent smothering."

Dr. King testified that smothering occurs when "something obstructs normal breathing" usually caused by "something cover[ing] the nose and mouth with or without pressure against the body." Dr. King also testified that in some cases of smothering, "you see pressure marks on the face" and "[s]mall hemorrhages [], primarily because of the pressure." However, sometimes there is no physical evidence that smothering occurred. Because smothering can occur without leaving any physical signs, Dr. King testified that smothering is "a diagnosis you make by excluding everything else possible." Dr. King based the cause of death on the fact that there was no apparent anatomic cause of death, "significant negative findings" from the autopsy, and "the investigation of the circumstances" of the victim's death. Dr. King testified that there was no "medical evidence to negate smothering" as a cause of death. Dr. King also testified that the evidence from the autopsy was "consistent with the way the [D]efendant said it happened on the tape." However, Dr. King admitted that he could not "say 100 percent that smothering was the cause of death. That's why [he] used the term apparent smothering." Dr. King also admitted that he felt the autopsy report was "not as complete as it should be" and that he felt that the medical examiner did not search for more subtle, physical signs of smothering that could have been present.

Dr. King admitted that at the time he made his findings regarding the cause of death, he did not have the toxicology report showing the presence of Verapamil in the victim's blood. However, Dr. King testified that he was "not that impressed with" the level of Verapamil in the victim's blood. Dr. King testified that Verapamil was "not a very effective overdose drug." Dr. King noted that the lethal concentration range for Verapamil was based on only 19 cases and that the treatise also "discusses patients who had Verapamil toxicity and survived" with Verapamil levels as high as 4,000 nanograms per milliliter. Dr. King also noted that the Defendant said that he had taken more pills than the victim had, and the Defendant survived. Dr. King testified that the level of Verapamil in the victim's blood would have been "acceptable as a cause of death if you don't have anything else." However, Dr. King further testified that "to call [the cause of death] Verapamil toxicity is just to ignore some really obvious excellent correlations and ignore the possibility that smothering could occur and the body look just like this." Dr. King further reiterated that he could not "ignore the whole case because there's a drug level that is slightly elevated."

Dr. King testified that as part of his examination, he had reviewed autopsy photographs of the victim's anus. Dr. King observed "a couple" of lacerations "around the circumference of the anus." Dr. King explained that a laceration "is a splitting or tearing of the skin or tissue." Dr. King further explained that this type of injury "is caused when the anus is stretched, distended, and then it splits." Dr. King noted that the lacerations "were very dry" and "lacked any sort of vital reaction" such as redness, swelling, or hemorrhage. Because there were no signs of a vital reaction, Dr. King concluded that the injuries to the victim's anus were caused postmortem.

Dr. Brian Frist, chief medical examiner for Cobb County, Georgia, testified as an expert in forensic pathology on behalf of the Defendant. Dr. Frist testified that the autopsy report showed no anatomic cause of death. However, the toxicology showed the presence of Verapamil "in levels high enough to cause death." Dr. Frist testified that the side effects of Verapamil included confusion, psychosis, and congestive heart failure. The toxicology report also showed the presence of Atenolol which increases the effects of the Verapamil. Dr. Frist testified that "unless [he] had other information," he would conclude that the victim died "from the drug interaction." However, given the Defendant's statements that he smothered the victim, Dr. Frist testified that he would list the cause of death as undetermined.

Dr. Frist testified that there was "nothing in the reports that could prove" whether the victim was smothered "one way or the other." Dr. Frist further testified that when a smothering occurs, petechial hemorrhages as well as other physical signs are found on the body in the majority of cases. However, Dr. Frist admitted that a person could die from smothering without there being any physical signs on the body. The autopsy report listed no physical signs that the victim had been smothered. However, Dr. Frist admitted that he could

not "tell you whether smothering occurred or didn't occur." Dr. Frist also testified that he was unable to conclude from the autopsy photographs whether the lacerations to the victim's anus were pre- or postmortem.

Based upon the foregoing evidence, the jury found the Defendant guilty of one count of premeditated first degree murder and one count of abuse of a corpse. On April 17, 2009, the trial court imposed a sentence of life for the premeditated first degree murder conviction. The trial court also imposed a two-year sentence for the abuse of a corpse conviction to be served concurrently to the life sentence.

## ANALYSIS

### *I. Severance*

The Defendant contends that the trial court erred by denying his motion to sever the abuse of a corpse charge from the premeditated first degree murder charge. In his brief, the Defendant concedes that joinder of the offenses was mandatory and that "in the instant case, [Tennessee Rule of Criminal Procedure] 14(b)(2)(A)[2] applies." However, the Defendant argues that the trial court erred by failing to apply the standard found in Rule 14(b)(1), which applies upon a motion to sever permissively joined offenses. The State responds that Tennessee Rule of Criminal Procedure 8(a) required mandatory joinder of the offenses and that the Defendant has failed to show how he was prejudiced by the decision to try the charges together. Alternatively, the State responds that Rule 14(b)(1) allowed for permissive joinder of the offenses over the Defendant's objections.

The State joined the offenses of premeditated first degree murder and abuse of a corpse by charging the offenses in the same indictment. Prior to trial, the Defendant filed a motion "pursuant to Rule 14[(b)](2)(A)" to sever the abuse of a corpse charge from the premeditated first degree murder charge. The Defendant argued that trying the two cases together would "unfairly prejudice[]" the Defendant and that the trial court had "discretionary authority to sever the charges to 'promote a fair determination of the [D]efendant's guilt or innocence of each offense.'" The State did not file a written response to the Defendant's motion to sever.

On January 26, 2009, the trial court held a hearing on this issue. At the hearing, defense counsel argued that the offenses should be severed because there was no "continuing scheme or plan," evidence of the abuse of corpse would not be admissible at a separate trial

_____

[2]Rule 14(b)(2)(A) provides for severance of mandatorily joined offenses prior to trial.

-17-

for the premeditated first degree murder charge, and the probative value of the abuse of a corpse evidence was "substantially outweighed" by its prejudicial effect. The State responded that evidence of the abuse of corpse charge was necessary to refute the Defendant's theory that the victim's death was part of a "suicide pact" and showed the Defendant's intent, plan, and motive. The State also noted that "[t]his [was] a mandatory joinder of offenses" and that defense counsel's analysis of the issue was "a little different" from the required analysis for severance of mandatorily joined offenses.

The trial court took the matter under advisement, but stated that it was inclined to deny the motion because evidence of the abuse of corpse offense negated the Defendant's theory and was "necessary for the State." On January 30, 2009, the trial court stated that "given the defense's theory . . . and the State['s] need to prove motive, I'm going to overrule the motion for severance." The trial court did not issue a written order nor did it issue any findings of fact or conclusions of law regarding this issue.

Our supreme court recently expressed its concern over the fact that "some trial courts and prosecutors continue to struggle with the proper application" of the rules of joinder and severance "in various factual contexts." State v. Garrett, 331 S.W.3d 392, 402 (Tenn. 2011). It is apparent from the record that all parties involved in the severance motion were confused with regard to the interplay between mandatory and permissive joinder, as well as what analysis was to be used in determining the outcome of the severance motion. Therefore, we once again address the proper procedure for determining a motion to sever offenses.

Tennessee Rule of Criminal Procedure 8 provides for two types of joinder of offenses: mandatory and permissive. Mandatory joinder is required when two or more offenses are "(A) based on the same conduct or arise from the same criminal episode; (B) within the jurisdiction of a single court; and (C) known to the appropriate prosecuting official at the time of the return of the indictment(s) . . . ." Tenn. R. Crim. P. 8(a)(1). If the State fails to join all of the required offenses, it will be barred from subsequently prosecuting the uncharged offenses that should have been joined, unless the charges were severed. Tenn. R. Crim. P. 8(a)(2); Tenn. R. Crim. P. 8, Advisory Comm'n Cmt. Permissive joinder provides that two or more offenses "may be joined . . . if: (1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b). The State may join offenses by filing a motion to consolidate or by simply charging multiple offenses in the same indictment. See Tenn. R. Crim. P. 13; 9 DAVID LOUIS RAYBIN, TENN. PRAC., CRIM. PRAC. & PROCEDURE § 17:2 (2010-11).

Once two or more offenses have been joined, either by having been charged in the same indictment or upon a motion to consolidate, a defendant may challenge the joinder through a motion to sever offenses. A trial court's decision denying a severance motion is

reviewed for abuse of discretion. Garrett, 331 S.W.3d at 401. If the offenses were permissively joined, "the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1). If the offenses were mandatorily joined, the State or the defendant may move for a severance prior to trial, and the trial court must grant the request if "the court finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(2)(A). Accordingly, a determination of whether joinder was mandatory or permissive is essential to a trial court's analysis of a severance motion.

Once a defendant files a motion to sever, "the trial court must hold a hearing to gather the information necessary to adjudicate the issue[.]"[3] Garrett, 331 S.W.3d at 403. The necessity of a hearing "is obvious" given "the analysis that a trial court must undertake in order to determine whether" to grant or deny a severance motion. Id. Additionally, "by holding a hearing and issuing findings of fact and conclusions of law, a trial court ensures that, on review, the appellate courts will have an adequate record from which to determine whether the trial court erred" by denying a severance motion. Id. For these reasons, our supreme court has emphasized "both the need for a hearing and the equally important requirement that the trial court support its ensuing ruling with findings of fact and conclusions of law." Id. As noted above, whether joinder was mandatory or permissive has significant effects for the State as well as the defendant and determines the analysis to be used in resolving whether to grant or deny a severance motion. Therefore, we conclude that the trial court should initially include in its findings of fact and conclusions of law a determination of whether joinder was mandatory or permissive,[4] in order to correctly decide the remaining severance issues.

In the present case, the trial court held a hearing on the Defendant's motion to sever the abuse of a corpse charge. However, no proof was taken at the hearing and only the arguments of counsel were presented. The trial court did not enter any findings of fact or conclusions of law on the matter. Additionally, the trial court was silent as to whether

---

[3]Garrett and our supreme court's previous decisions on this issue discuss the necessity of a hearing when the State seeks consolidation of the offenses and the defendant objects pursuant to Rule 14. However, we can see no reason why this rule should not apply when the State has joined offenses in the indictment and the defendant files a motion to sever pursuant to Rule 14.

[4]We also note that where multiple offenses are joined by having been charged in the same indictment, the State is silent as to whether or not it views the joinder as being mandatory or permissive. While the Defendant in this case repeatedly conceded that joinder was mandatory, it would be prudent for the State to file a written response regarding whether joinder was mandatory. At the very least, the State should provide more argument than the passing reference to mandatory joinder made at the pretrial hearing.

joinder was mandatory or permissive and failed to discuss which analysis it had applied. In reviewing a denial of a severance motion, a trial court's error in failing "to utilize the proper procedure and analysis" does not mean that the offenses should not have been joined. Garrett, 331 S.W.3d at 404. Instead, the reviewing court "must conduct the analysis that the trial court failed to conduct." Id.

Rule 8(a) requires mandatory joinder of offenses that are "based on the same conduct or arise from the same criminal episode." "Same conduct" offenses involve "a single act that results in a number of interrelated offenses." State v. Johnson, 342 S.W.3d 468, 473 (Tenn. 2011). "Same criminal episode" or "single criminal episode" offenses "normally are generated by separate physical actions." Id. at 474 (quoting 2 ABA Standards for Criminal Justice § 13-1.2 cmt., at 13.10). However, the acts "must occur simultaneously or in close sequence and must occur in the same place or in closely situated places." Id. A gap in time between the acts "may be sufficient to interrupt the temporal proximity required for a single criminal episode to exist." Id. at 475

In addition to the time and place requirements, another "critical characteristic of single episode offenses" is that "proof of one offense necessarily involves proof of the others." Johnson, 342 S.W.3d at 475 (quoting 2 ABA Standards for Criminal Justice § 13-1.2 cmt., at 13.10). Put another way, "proof of one offense must be inextricably connected with the proof of the other or [] the proof of one offense forms a substantial portion of the proof of the other offense." Id. (internal quotation marks and citations omitted). The offenses "need not be based solely on the same facts," but "a substantial interrelationship between the evidence required to prove each of [the] several offenses" is required. Id. For example, where a second offense occurs during the investigation of another offense, evidence pertaining to the second offense "would necessarily require proof pertaining" to the original offense. State v. Shepherd, 902 S.W.2d 895, 903 (Tenn. 1995) (defendant assaulted two law enforcement officers who were attempting to question him about the original offense).

The charges against the Defendant arose from two separate acts; therefore, the offenses must have been part of the "same criminal episode" in order for joinder to have been mandatory. The evidence reflects that both offenses occurred on the same bed in Room 128 of the Hampton Inn on Shallowford Road in Chattanooga. While the two offenses did not occur simultaneously, they did occur in close sequence. The victim was last seen alive during the early morning of Thursday, June 15, 2006. In his statement, the Defendant said that he had killed the victim and performed anal sex on her body before his attempts to kill himself on the afternoon Friday, June 16, 2006. Both offenses occurred sometime within this window of time. Additionally, "[e]vidence of the victim's death is an element of the offense of" abuse of a corpse. State v. Furlough, 797 S.W.2d 631 (Tenn. Crim. App. 1990) (addressing a previous version of the statute). The key piece of evidence for both charges

was the Defendant's recorded statement admitting to both offenses. In the statement, the Defendant makes clear that his abuse of the victim's corpse was "inextricably connected" to the victim's murder. The Defendant stated that the victim agreed to allow him to have anal sex with her corpse after he smothered her to death. Accordingly, we conclude that joinder of the offenses was mandatory.

Rule 14(b)(2)(A) allows for a severance of mandatorily joined offenses when "it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence for each offense." A trial court's denial of a severance motion filed pursuant to Rule 14(b)(2)(A) "will not be reversed unless the [defendant] was prejudiced by the decision to try the charges together." State v. Thompson, 88 S.W.3d 611, 614 (Tenn. Crim. App. 2000). The Defendant has presented no evidence that he was prejudiced by the joinder of these offenses. Instead, the Defendant has repeatedly argued that joinder was improper because the State did not satisfy the standard found in Rule 14(b)(1), which applies upon a motion to sever permissively joined offenses. Following our review, we conclude that there is no evidence contained in the record that the Defendant was prejudiced by the joinder of the offenses. Accordingly, we conclude that severance of the offenses was not required by Rule 14(b)(2)(A).

## II. Scope of Dr. Robert's Expertise

The Defendant contends that the trial court erred in allowing a toxicologist to testify regarding his opinion on the likelihood that prescription drugs found in the victim's blood caused her death. The Defendant argues that Dr. Robert could not testify as to the whether the drugs found in the victim's blood caused her death because Dr. Robert was not a medical examiner. The Defendant further argues that Dr. Robert's testimony was beyond the scope of his expertise as a toxicologist. The State responds that Dr. Robert's testimony was within the scope of his expertise as a toxicologist.

Questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997). Pursuant to Tennessee Rule of Evidence 702, an expert may testify "in the form of an opinion or otherwise" when the "scientific, technical, or other specialized knowledge" offered by the witness will substantially assist the trier of fact. Tennessee Rule of Evidence 703 requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." A trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or abused. State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). "A trial court abuses its discretion if it applies an incorrect legal standard or reaches an illogical or

unreasonable decision that causes an injustice to the complaining party." Brown v. Crown Equip. Corp., 181 S.W.3d 268, 273 (Tenn. 2005) (citing Stevens, 78 S.W.3d at 832).

"When assessing the admissibility of expert testimony, the trial court must first determine whether the witness is qualified by knowledge, skill, experience, training, or education to express an opinion within the limits of his or her expertise." State v. Scott, 275 S.W.3d 395, 402 (Tenn. 2009) (citing Stevens, 78 S.W.3d at 834). "This determination hinges upon whether the proposed expert's testimony authorizes him or her to give an informed opinion upon the fact or issue for which his or her testimony is being proffered." Scott, 275 S.W.3d at 402 (citing Stevens, 78 S.W.3d at 834). "The witness may acquire the necessary expertise through formal education or life experiences." State v. Reid, 91 S.W.3d 247, 302 (Tenn. 2002) (citation omitted). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." Id.

The Defendant is incorrect in his assertion that only a medical examiner or forensic pathologist may testify as to cause of death. This state's courts have repeatedly held that "[a]n expert does not have to be a forensic pathologist in order to give an opinion as to cause of death." State v. Robinson, 73 S.W.3d 136, 150 (Tenn. Crim. App. 2001) (concluding that a toxicologist and licensed medical doctor was qualified to testify as to the victim's cause of death). However, Dr. Robert admitted on cross-examination that he was not a medical examiner, that he had never performed an autopsy, that he had never signed a death certificate, that he had never made a legal determination "on the cause of the death," and "[t]hat's outside [his] area of expertise." While Dr. Robert may not have been qualified to testify as to the victim's ultimate cause of death, his opinion as to whether the amount of drugs in the victim's blood could have caused her death was within the scope of his expertise as a toxicologist.

Toxicology is the "branch of medicine that concerns poisons, their effects, their recognition, their antidotes, and generally the diagnosis and therapeutics of poisoning." BLACK'S LAW DICTIONARY 1529 (8th ed. 2004); see also Jordan v. Santa Fe Eng'g, Inc., 402 S.E.2d 304, 306-07 (Ga. Ct. App. 1991) (concluding that a toxicologist was qualified to testify as to the effect of chemicals on the body). Dr. Robert was fully qualified to testify as an expert in the field of toxicology. Additionally, Dr. Robert testified that a significant portion of his work involved postmortem testing to assist in the determination of cause of death. Dr. Robert was not asked to render an opinion as to the ultimate cause of the victim's death. Instead he was asked if, in his expert opinion, he believed the drugs found in the victim's blood could have caused her death. Dr. Robert responded that "in [his] opinion, because of the fact that these concentrations singularly [were] not extremely high

-22-

concentrations, that it is in [his] opinion not a sound conclusion to believe that these concentrations would in and of themselves be [the] cause of death in a particular individual." Dr. Robert's testimony merely provided his opinion as to the likely effect of the drugs on the victim. Accordingly, we conclude that the trial court did not error in admitting Dr. Robert's testimony.

*III. Mistrial*

The Defendant contends that the trial court erred in failing to grant his motion for a mistrial following a statement by Dr. King that a previous test showed the victim's level of Verapamil to be 3,400 nanograms per milliliter. At trial, the Defendant argued a mistrial was appropriate because the State failed to disclose the previous test results. On appeal, the Defendant argues that a mistrial was appropriate because Dr. King's statement was detrimental to his case. The Defendant further argues that "[o]nce the jury heard the [number] '3,400,' . . . the cat was out of the bag, and the [trial court's curative] instruction did not, and could not have, put it back in." The State responds that the trial court issued a proper curative instruction and that the Defendant has failed to establish any prejudice to his case caused by the trial court's failure to grant a mistrial.

As part of a lengthy response to a question on cross-examination about whether the victim's Verapamil level was within the lethal concentration range, Dr. King stated that the victim's Verapamil level was "at 5,400, which I'm told is the second test that was done. The first test that was done was 3,400." Lead defense counsel immediately objected to Dr. King's reference to the first Verapamil test. The trial court held a bench conference on the objection. Lead defense counsel stated that he objected because Dr. King made an "incorrect statement that was not testified to by the person who did the testing." Lead defense counsel then stated, "I think we need an instruction on that." During the discussion, defense co-counsel repeatedly asked for a mistrial because the State had not previously provided the results of the first Verapamil test. The trial court denied the motion for a mistrial and provided an instruction to the jury to disregard Dr. King's mention of "3,400" nanograms per milliliter. Defense counsel did not challenge the sufficiency of the curative jury instruction.

The determination of whether to grant a mistrial lies within the sound discretion of the trial court and should be granted "only in the event of a 'manifest necessity' that requires such action." State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (appendix). A manifest necessity only exists "when there is no feasible alternative to halting the proceedings." State v. Martin, No. M2007-02097-CCA-R3-CD, 2009 WL 1372287, at *23 (Tenn. Crim. App. May 18, 2009) (quoting State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981)) (quotation marks omitted), perm. app. denied (Tenn. Oct. 5, 2009). The burden of establishing a "manifest necessity" lies with the party seeking the mistrial. State v. Williams, 929 S.W.2d

385, 388 (Tenn. Crim. App. 1996). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Id. A trial court's decision regarding whether to grant a mistrial will only be overturned upon a showing of an abuse of discretion. Id.

The Defendant originally requested a mistrial on the grounds that the State had failed to provide him with the first test results. Upon a defendant's request, the State is required to disclose "the results or reports . . . of scientific tests or experiments if . . . the item is material to preparing the defense or the [S]tate intends to use the item in its case-in-chief at trial." Tenn. R. Crim. P. 16(a)(1)(G); see also State v. Aucoin, 756 S.W.2d 705, 714 (Tenn. Crim. App. 1988) ("[T]he rule specifically limits discovery to scientific reports, tests, and experiments 'intended for use by the State as evidence in chief'"). There is no evidence that the State ever intended to use the results of the first Verapamil test at trial. The State did not ask any of the expert witnesses about the results of the original Verapamil test. Dr. King's statement was made in response to a question asked by defense counsel on cross-examination. Additionally, the original test result was not "material to preparing the defense" because it showed a lower Verapamil result than the second test which was used at trial. Accordingly, we conclude that the State did not violate Tennessee Rule of Criminal Procedure 16 by failing to disclose the results of the first Verapamil test.

Additionally, the State's failure to disclose the original test results did not constitute a violation of Brady v. Maryland, 373 U.S. 83 (1963). In order to establish a due process violation under Brady the suppressed evidence must have been favorable to the accused. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Here the original test results were detrimental to the Defendant's case because they showed the victim's blood contained a much lower amount of Verapamil than the second test results. Accordingly, we conclude that the State's failure to disclose the results of the original Verapamil testing did not constitute a manifest necessity requiring a mistrial.

The Defendant also contends that a mistrial was required because the possibility of a lower Verapamil result was damaging to his case. However, the trial court issued a proper curative instruction for the jury to disregard any mention of "3,400." The jury is presumed to have followed a trial court's curative instruction. State v. Reid, 164 S.W.3d 286, 342 (Tenn. 2005) (citing Hall, 976 S.W.2d at 148). The Defendant failed to either object to the trial court's instruction or request a more complete instruction. A defendant "will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequences of his own neglect or misconduct." State v. Robinson, 146 S.W.3d 469, 493 (Tenn. 2004) (quoting Norris v. Richards, 246 S.W.2d 81, 85 (Tenn. 1952)) (quotation marks omitted). To that end, "[i]f a party fails to request a curative instruction, or if dissatisfied with the instruction given and

-24-

does not request a more complete instruction, the party effectively waives the issue for appellate purposes." State v. Griffis, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997). Therefore, the Defendant has waived appellate review of this issue. Accordingly, we conclude that the trial court did not err in denying the Defendant's motion for a mistrial.

## IV. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The Defendant argues that, besides his statements that he killed the victim by smothering her, there was "no proof that the victim had been suffocated." The Defendant also argues that Dr. King's finding that the cause of death was "apparent smothering" was "not based upon medical findings or proof," but upon the Defendant's statements. The Defendant makes no argument as to why the evidence is insufficient to sustain his conviction for abuse of a corpse. The State responds that the evidence submitted at trial was sufficient to sustain the Defendant's convictions.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Our supreme court recently clarified that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude very other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted). Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of

such evidence." Id. at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. June 15, 2011).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted). The element of premeditation only requires the Defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

The Defendant was convicted by a combination of both direct and circumstantial evidence. The key piece of evidence at trial was a tape recording by the Defendant in which he repeatedly stated that he smothered the victim. The Defendant also repeatedly asserted that he and the victim planed her death and decided that he would smother her because the victim "didn't know if she could be brave enough to go through it herself on her own without me doing it for her." (Emphasis added). Additionally, the Defendant told detective two days after the victim's body was found that this case was a "murder-suicide." In addition to this direct evidence, the victim's husband testified about the Defendant's harassing behavior in

the months before the murder and that the victim was in good spirits before she disappeared. Mr. Smith testified that the victim would never commit suicide. David Scissom testified that he took the Defendant to a field near a sewage treatment plant to meet a woman. Mr. Smith testified he lived near a sewage treatment plant. There was also evidence that a male caller from the Defendant's hotel room requested "[n]ot to be disturbed . . . not for anyone to know that they [were] even on the property" because "he was in an argument, a fight with his fiancee."

With respect to the medical evidence, Dr. King explained that in making a determination as to cause of death, he considered both the facts of the case and the medical evidence. Dr. King testified that parts of the autopsy report "perfectly" matched the Defendant's statements, but Dr. King never elaborated on what those parts were. Dr. King did testify that a person could die from smothering but leave no physical signs of such, and that by excluding other possible causes of death he was able to conclude the victim died of "apparent smothering." Even the Defendant's own expert witnesses admitted that smothering could leave no physical signs and that he would have listed the victim's cause of death as undetermined given the Defendant's statements. Regarding the victim's Verapamil level, both Dr. King and Dr. Robert testified as to the weaknesses of the studies determing the lethal concentration range for Verapamil. Both also testified that in their opinion the Verapamil level was too low to cause the victim's death. Additionally, the Defendant repeatedly stated that "the pills" the victim took "didn't work." The State also emphasized the fact that the Defendant lived despite the fact that he claimed to have taken more pills than the victim, in addition to a significant amount of sleeping pills. The possibility that the victim died from a Verapamil overdose was a permissible inference the jury could have made from the evidence. However, the State was not required to eliminate all other permissible inferences. Instead, the State presented an equally, or based upon the evidence perhaps more, reasonable inference which the jury chose to accredit over the Defendant's theory. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for premeditated first degree murder.

With respect to the abuse of a corpse charge, a person "without legal privilege" commits the offense by physically mistreating a corpse "in a manner offensive to the sensibilities of an ordinary person." Tenn. Code Ann. § 39-17-312(a)(1). The Defendant failed to make any argument in his brief on this issue, and has thereby waived appellate review of the issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument . . . will be treated as waived in this court."). Furthermore, the Defendant stated that he performed anal sex on the victim's body, and Dr. King testified that the wounds on the victim's anus appeared to be inflicted postmortem. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for abuse of a corpse.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE